## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY | |
| PLAINTIFF, | COMPLAINT AND JURY DEMAND |
| V. | Civil Action No.:  3:20-cv-47 |
| ASSOCIATED UNIVERSITIES, INC., | |
| AND | |
| JOSEPH MARINO, | |
| AND | |
| RONALD YUHAS, | |
| DEFENDANTS. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff,  PHILADELPHIA INDEMNITY INSURANCE COMPANY, by

and through its attorneys, LEWIS BRISBOIS BISGAARD & SMITH LLP, and for its Complaint for

Declaratory Judgment, against ASSOCIATED UNIVERSITIES, INC., JOSEPH MARINO and

RONALD YUHAS, alleges, states, and avers the following:

## INTRODUCTION

1.      This is a coverage action seeking declaratory relief pursuant to 28 U.S.C. §§ 2201 and

2202.  Plaintiff Philadelphia Indemnity Insurance Company ("PIIC") seeks a determination that it

has  no  duty  to  defend  or  indemnify  Defendant  Associated  Universities,  Inc.  ("AUI")  under

Commercial General Liability and Commercial Umbrella Liability Policies that PIIC issued to AUI

with respect to two separate but related underlying  Complaints filed against AUI.  One underlying

action, filed by Defendant Joseph Marino ("Marino"), captioned *Joseph Marino v. Brookhaven Science Associates, L.LC, et al*, is currently pending in the United States District Court, Eastern District of New York, at No. 2:19-cv-04839-GRB-RML (the "Marino Action").  The other underlying action, filed by Defendant Ronald Yuhas, captioned *Ronald Yuhas v. Associated Universities, Inc. at al*, is currently pending in the United States District Court, Eastern District of New York at No. 2:19-cv-05475 (the "Yuhas Action") (collectively, the Marino Action and Yuhas Action are referred to hereinafter as the "Underlying Actions").

## PARTIES, JURISDICTION AND VENUE

2.    Jurisdiction in this matter is based upon diversity of citizenship pursuant to 28 U.S.C. §1332(a)(1).

3.    PIIC is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Bala Cynwyd, Pennsylvania.

4.    Defendant AUI is a not-for-profit entity organized under the laws of the State of New York with its principal place of business in Washington, D.C.

5.    Defendant Marino is a resident of the County of Suffolk, State of New York and is joined in this suit as a party defendant by virtue of his status as the claimant against AUI in the Marino Action, and for which no relief is sought.

6.    Defendant Yuhas is a resident of the County of Suffolk, State of New York and is joined in this suit as a party defendant by virtue of his status as the claimant against AUI in the Marino Action, and for which no relief is sought.

5.    In the Underlying Actions, each Plaintiff seeks $25 million from the defendants, including AUI. Each of the CGL Policies that PIIC issued to AUI has limits of liability in the amount of $1 million each occurrence and $2 million in the aggregate.

7.    Therefore, diversity jurisdiction exists because: (a) there is complete diversity of citizenship between Plaintiff, PIIC, on the one hand, and all Defendants, on the other hand; and (b) the amount in controversy, including the potential costs of both defending and indemnifying AUI in the Underlying Actions, substantially exceeds $75,000.

8.    Venue is appropriate under 28 U.S.C. § 1391 because many of the acts – *i.e.*, the making of and the delivery of the insurance contracts at issue occurred in the Western District of Virginia and more specifically at AIU's National Radio Astronomy Observatory located in Charlottesville, Virginia.

9.    AUI has requested that PIIC defend and indemnify AUI against the Underlying Actions and PIIC is currently defending AUI subject to a complete reservation of rights.  PIIC contends that it has no defense or indemnity obligation for the Underlying Actions.  As a result, an actual controversy exists between PIIC, on the one hand, and AUI, on the other hand, and by the terms and provisions of Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, this Court is vested with the power to declare the rights and liabilities of the parties hereto and to grant such relief as it deems necessary and proper.

## FACTUAL BACKGROUND

### A.  AIU's Application for Insurance

10.    In October 2014, AUI, through its insurance broker, Marsh USA, Inc. ("Marsh"), submitted a document to PIIC entitled "Specifications of Insurance" that set forth a description of AUI's  operations, locations and types of insurance AUI was seeking to acquire to insure those operations and locations ("Specifications").  (**Exhibit "A"**).

11.    Marsh submitted the Specifications to PIIC as part of AUI's application for insurance.

12.    According to the Specifications, AUI was established in 1946 as an educational institution dedicated to research, development, and education in the physical, biological and

engineering sciences and consisted of Columbia, Cornell, Harvard, Johns Hopkins, MIT, University

of Pennsylvania, Princeton, University of Rochester, and Yale.  *Id*.

13.    The Specification provided that "The original charter of AUI was to 'acquire, plan,

construct and operate laboratories and facilities that would unite the resources of universities, other

research organizations and the Federal Government.'"  *Id*.

14.    In 1955, AUI proposed the establishment of a national radio observatory and since

1956, has managed the National Radio Astronomy Observatory ("NRAO") for the National Science

Foundation.  *Id*.

15.    The NRAO is headquartered in Charlottesville, Virginia where it designs, builds and

operates high-sensitivity telescopes for use by scientists around the world.  *Id*.

16.    The NRAO also has facilities in Chile, West Virginia and New Mexico.

17.    Pursuant to the Specifications, all of the facilities are limited to operations that consist

of various radio telescopes/observatories and ancillary facilities such as dormitories for visiting

astronomers.  *Id*.

18.    The Specifications sought commercial property coverage for certain personal property

at AUI managed facilities in Virginia, West Virginia, Washington, D.C. and New Mexico; the

United States government provided property coverage for the buildings.  *Id*.

19.    The Specifications also contained a schedule of locations: for AUI, the schedule listed

a Washington, D.C. office building; for NRAO, the scheduled listed facilities in Arizona, California,

Hawaii, Iowa, New Hampshire, New Mexico, Texas, Virgin Islands, Virginia, Washington and West

Virginia.  *Id*.

20.     The Specifications also contained a section labeled "Extensions of Coverage" that set for a list of items whereby Marsh sought enhancements of coverage based on various industry endorsements, such as a waiver of subrogation endorsement, identified as "CG 2404." *Id*.

21.     The Extension of Coverage did not list any endorsement or enhancement for locations no longer managed by AUI or for AUI's discontinued operations. *Id*.

22.     For each geographic location, the Specifications provided a brief description of the operations at each location. *Id*.

23.     For example, for the Green Bank West Virginia location, the Specifications identified operations consisting of an inactive landing strip, swimming pool, playground, rifle range and babysitting service. *Id*.

24.     The Specifications stated that the remoteness of the West Virginia and New Mexico locations present "several unique exposures [that] are not uncommon to other educational institutions." *Id*.

25.     The Specifications requested that the Named Insured for all insurance coverage sought for the identified facilities include both AUI and NRAO. *Id*.

26.     In addition to seeking Commercial Property Coverage, the Specifications also sought, among others, Commercial General Liability ("CGL") coverage and Commercial Umbrella Liability ("Umbrella") coverage. *Id*.

27.     Beginning in December 2014 up through December 2020, PIIC issued to AUI and NRAO a series of annual Commercial Package Policies that contained a CGL Coverage Part (collectively, the "CGL Policies") (the CGL section of 2014-2015 Commercial Package Policy is attached at **Exhibit "B"**).

28.     PIIC issued the following CGL Policies to AUI/NRAO:

      a.      PHPK1263422      12/01/14 to 12/01/15

      b.      PHPK1423759      12/01/15 to 12/01/16

      c.      PHPK 1581668      12/01/16 to 12/01/17

      d.      PHPK1745806      12/1/17 to 12/1/18

      e.      PHPK1910186      12/1/18 to 12/01/19

29.     For the same period, PIIC issued AUI and NRAO a series of annual umbrella policies (collectively, the "Umbrella Policies") (the 2014-2015 Umbrella Policy is attached at **Exhibit "C"**).

30.     PIIC issued the following Umbrella Policies to AUI/NRAO:

      a.      PHUB481961      12/01/14 to 12/01/15

      b.      PHUB522474      12/01/15 to 12/01/16

      c.      PHUB3564731      12/01/16 to 12/01/17

      d.      PHUB609296      12/01/17 to 12/01/18

      e.      PHUB65521      12/01/18 to 12/01/19

(collectively, the CGL Policies and the Umbrella Policies are hereinafter referred to as the "PIIC Policies").

31.     Each year, up until 2019, Marsh submitted to PIIC specifications that were substantially similar in format and scope to the Specifications.

32.     None of the specifications submitted by Marsh on behalf of AUI and NRAO ever identified any locations within the state of New York.

33.     None of the specifications submitted by Marsh on behalf of AUI and NRAO ever identified the Brookhaven National Laboratory ("BNL"), located in Upton, New York, as one of the locations for which AUI or NRAO sought insurance for from PIIC.

34.     None of the specifications submitted by Marsh on behalf of AUI and NRAO ever disclosed that AUI had managed BNL from 1946 to 1998 for the U.S. Department of Energy ("DOE").

35.     None of the specifications submitted by Marsh requested insurance for AUI's discontinued operations at BNL or AUI's handling or distributing of products at BNL.

36.     While AUI managed BNL form 1946 to 1998, none of DOE's operations at BNL involved telescopes or observatories.

37.     The first CGL Policy PIIC issued to AUI/NRAO, policy no. PHPK1263422,  was effective December 1, 2014 to December 1, 2015 (the "2014 CGL Policy") (**Exhibit "B").**

38.     The Declarations page for the 2014 CGL Policy identifies the Insured's form of business as a "Non Profit Organization" and contains a Location Schedule setting forth 16 separate locations by address.  *Id*.

39.     None of the locations listed in the Location Schedule for the 2014 CGL Policy contained any location in New York.  *Id*.

40.     None of the Location Schedules on any CGL policy that PIIC issued to AUI listed any location in New York.

41.     The 2014 CGL Policy also contained a Supplemental Schedule that lists the premium rating for each insured location.  (**Exhibit "B").**

42.     Pursuant to the Supplemental Schedule, there is no classification for any property in New York and no corresponding premium charge for either premises/operations or for completed operations for any property located in New York.

**B.     The PIIC Insurance Policies**

**1. The CGL Policies**

43.    The CGL Polices contained the following Insuring Agreement and pertinent definitions that are set forth in form CG 00 01 12 07:

### 1. Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

* * *

b.  This insurance applies to "bodily injury" and "property damage" only if:

(1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) the "bodily injury" and "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1**. of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1**. Of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation,

change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1**. of Section **II** – Who is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

     (1)  Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

     (2)  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

     (3)  Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

\* \* \*

SECTION V - DEFINITIONS

   3.  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\* \* \*

   13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

   15.  "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   44.  The CGL Policies contained the following pertinent exclusions:

This insurance does not apply to:

This insurance does not apply to:

   **a.  Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

\* \* \*

**d.  Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law

**e.  Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of an in the course of:

(a)  Employment by the insured; or

(b)  Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**f.  Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such

premises, site or location has been ' added to your policy as an
additional insured with respect to your ongoing operations
performed for that additional insured at that premises, site or
location and such premises, site or location is not and never was
owned or occupied by, or rented or loaned to, any insured, other
than that additional insured; or

**(iii)** "Bodily injury or "property damage" arising out of heat, smoke or
fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time
used by or for any insured or others for the handling, storage,
disposal, processing or treatment of waste;

\* \* \*

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that
any insured or others test for, monitor, clean up, remove, contain,
treat, detoxify or neutralize, or in any way respond to, or assess the
effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages
because of testing for, monitoring, cleaning up, removing, containing,
treating, detoxifying or neutralizing, or in any way responding to, or
assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because
of "property; damage" that the insured would have in the absence of such
request, demand, order or statutory or regulatory requirement, or such
claim or "suit" by or on behalf of a governmental authority.

\* \* \*

45.     Section IV – Commercial General Liability Conditions – contains the following

pertinent condition:

**6.  Representations**

By accepting this policy, you agree:

a.   The statements in the Declarations are accurate and complete;

b.   Those statements are based upon representations you made to
us; and

c.  We have issued this policy in reliance upon your representations.

## 2.  The Umbrella Policies

46.    The Umbrella Policies utilized form PI-CXL-001 (03/14), which contained the following Insuring Agreement:[1]

### 1.  Insuring Agreement

We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit", whether or not collectible, which the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.

**Bodily Injury and Property Damage**

a.  This insurance applies to "bodily injury" or "property damage" only if:

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1.a.** of **SECTION II – WHO IS AN INSURED** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

b.  "Bodily injury" or "property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1.a. of SECTION II – WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence"

---

[1] PIIC also utilized form PI-CXL-001 (09/12), which is substantially similar to the 03/14 form, in certain of its Umbrella Policies issued to AUI.

or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**c.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.a.** of **SECTION II – WHO IS AN INSURED** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

Section V – Definitions contains the following pertinent definitions:

**3.** "Applicable Underlying Limit" means:

**a.** If the policies of "underlying insurance" apply to the "occurrence" or "offense", the greater of:

**(1)** The amount of insurance stated in the policies of "underlying insurance" in the Declarations of any other available insurance less the amount by which any aggregate limit so stated has been reduced solely due to payment of claims; or

**(2)** The "retained limit" shown in the Declarations or

**b.** If the policies of "underlying insurance" do not apply to the "occurrence" or "offense," the amount stated in the Declarations as the "retained limit".

\* \* \*

**15.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

**17.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\* \* \*

**20.** "Retained Limit" is the amount stated in the Declarations as such.  If the policies of "underlying insurance" do not apply to the "occurrence" or offense, the insured shall retain this amount as self-insurance with respect to:

   **(a)** "Bodily injury" or "property damage" caused by each "occurrence"; or

   **(b)** "Personal and advertising injury" sustained by any one person or organized.

\* \* \*

**23.** "Ultimate net loss" means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

47.    The Umbrella Policies contained the following pertinent exclusions:

This insurance does not apply to:

 **a. Expected or intended Injury**

   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

 **b. Workers Compensation and Similar Laws**

   Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation or any similar law.

 **c. Employment Related Practices**

   "Bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment related practices, policies, acts or omissions such as discrimination, criticism, self-defamation, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or malicious prosecution directed at that person;

o r

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a),** **(b),** or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a), (b),** or **(c)** above occurs before, during or after employment of that person.

(2) Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or to repay someone else who must pay damages because of the injury.

\* \* \*

This insurance does not apply to:

**o.  Pollution**

**(1)** "Bodily injury," "property damage" or "personal and advertising injury" arising out of the actual alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fume, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that

is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

\* \* \*

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(iii)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as a part of the operations being performed by such insured, contractor or subcontractor;

**(iv)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into

that building in connection with operations being
performed by you or on your behalf by a contractor
or subcontractor; or

**(v)** "Bodily injury" or "property damage" arising out of
heat, smoke or fumes from a "hostile fire."

\* \* \*

48. The Umbrella Policies, under the Defense of Claims or Suits and Supplementary

Payments provision, states in pertinent part that:

e. We will have no duty to defend the insured against any claim or "suit"
that any other insurer has a duty to defend. If we elect to join in the
defense of such claims or "suits," we will pay all expenses we incur, but
we will not contribute to the expenses of the insured or the "underlying
insurer."

49. Section IV of the Umbrella Policies – Conditions – contains the following pertinent

condition:

### 14. Representations or Fraud

By accepting this insurance, you agree:

**a.** The statements in the Declarations and any subsequent notice
relating to "underlying insurance" are accurate and complete;

**b.** Those statements are based upon representations you made to
us;

**c.** We have issued this insurance in reliance upon your
representations; and

**d.** This policy is void in any case of fraud by you as it relates to
this policy or any claim under this policy.

### C.    The Marino Action

50. On July 15, 2019, Marino filed a verified complaint in the Supreme Court of New

York, Suffolk County naming Brookhaven Science Associates ("BSA"), LLC, AUI, ZEP, Inc. and

Dow Chemical Company ("Dow") as Defendants (the "Marino Action").

51.     On August 22, 2019, BSA filed a Notice of Removal to the U.S. District Court for the Eastern District of New York.  (**Exhibit "D"**).

52.     On October 9, 2019, Marino filed an Amended Complaint ("**Exhibit "E"**).

53.     Marino alleges that from 1947 to 1998, AUI contracted with the DOE for the operation and management of BNL, a 5,300 acre facility located in Upton, New York.  (*Id*. ¶¶ 28, 61, 65, 68).

54.     Mario claims to have developed carcinoma of the kidney and chronic kidney disease as a result of his use of trichloroethylene ("TCE") and other toxic substances during his work at BNL as a computer technician for Carlyle Technical Services, L.L.C. and Entex, Inc. (*Id*. ¶ 52).

55.     Marino asserts that AUI negligently supplied, directed and instructed him to use TCE solvents during the course of his work at BNL without providing protective measures or warnings against the danger of TCE exposure, including TCE's classification as a known carcinogen. (*Id*. 54).

56.     Marino alleges that AUI fraudulent concealed the fact that BNL was contaminated with TCE and other toxins, in the buildings, structures, facilities, soils, surface waters, groundwaters, ambient indoor air and drinking water supplies.  (*Id*. ¶ 56).

57.      Marino descries BNL as an atomic, nuclear and high-energy physics, chemical and biological research facility with numerous buildings, structures, scientific facilities including three nuclear reactors.  (*Id*. 62).

58.     AUI, as an operating contractor of BNL, was responsible for, among other things, protection of the surrounding environment and ensuing compliance with regulations to protect the site and people from environmental pollution and toxic contamination.  (*Id*. ¶74).

59.     During its tenure as operating contractor at BNL, AUI engaged in operations that involved the discharge, release and disposal of radioactive fuels, toxic chemicals and substances known to be hazardous to human health.  (*Id*. ¶ 77-78).

60.     During its tenure as operating contractor at BNL, AUI negligently discharged, released and produced various radioactive substances and toxic chemicals that resulted in, among other things, severe and pervasive pollution and contamination of the surrounding environment. (*Id*. ¶ 79, 81).

61.     In 1989, due to the severe environmental pollution at BNL, the U.S. Environmental Protection Agency declared BNL a Superfund Site.  (*Id*. ¶ 86).

62.     TCE, volatile organic compounds ("VOCs"), benzene and heavy metals were among the toxic chemicals used by AUI in the course of its operation of BNL.  (*Id*. ¶  100-104).

63.     Marino alleges that by the 1990s, BNL employees, contractors and subcontractors were well acquainted with the saying "Science over safety."  (*Id*. ¶ 107).

64.     Computer technicians at BNL were supplied with TCE in aerosol form to use as a solvent, degreaser and cleaning solution. (*Id*. ¶ 120).

65.     AUI directed workers to discharge, release and discard used TCE into sinks, basins, floor drains, sewers, septic sewer systems, sewer pipes, cesspools, soils, tranches, shafts, holes, discharge basins and landfills.  (*Id*. ¶ 126).

66.     Due to its toxicity to humans, DOE banned the use of TCE at its facilities in 1990, resulting in AUI stockpiling it at BNL for future use, resulting in Marino's continued use of TCE up past 2006 (*Id*. ¶ 133, 135-36).

67.     Marino claims that TCE was discharged and released at BNL as documented in reports from 1994 to 2006, detailing the location and concentrations of TCE spills in soil and groundwater going back to the 1950s.  (*Id*. ¶¶ 148-163),

68.     Marino claims to have worked at BNL from September 20, 1999 to December 21, 2000 when he extensively used TCE as a cleaning agent.  (*Id*. ¶ 173. 175).

69.     Marino alleges that he was exposed to hazardous levels of TCE through routes of inhalation, trans-dermal contact, ingestion and vapor intrusion in the ambient indoor air. (*Id*. ¶ 194),

70.     On March 10, 2009, Marino allegedly was diagnosed with clear cell renal carcinoma in the right kidney. (*Id*. ¶ 210).

71.     He claims to have developed chronic kidney disease in the left kidney, that was diagnosed on or about March 1, 2018). (*Id*. ¶ 214).

72.     The kidney cancer and chronic kidney disease were determined to be part of the same renal injury – TCE exposure – manifested over a continuum of time.  (*Id*. ¶ 215).

73.     Marino claims that the U.S. EPA issued violation notices to AUI in March 1998 due to violation of various federal environmental laws.  (*Id*. ¶ 280-81).

74.     Mario alleges that he was unaware that his TCE exposure was possibly related to his kidney cancer until December 2016. (*Id*. ¶ 304).

75.     In February 2017, Marino submitted a claim for benefits under the U.S. Department of Labor's ("DOL")  EEOICP's Part E as a result of his kidney cancer.  (*Id*. ¶ 308).

76.     On April 6, 2018, the DOL recognized Marino's claim under the EEOICP, which found that Mario's cancer is directly related to his occupational exposures at BNL. (*Id*. ¶ 316).

77.     Mario alleges that it was not until August 6, 2018, when he was shown numerous reports on the pervasive contamination of BNL by contaminants such as TCE, heavy metals and

benzene in buildings, soils, surface water, groundwater and drinking water supplies at BNL that he could identify "the cause of his injury" or the parties responsible for those injuries. (*Id*. ¶¶ 327, 332).

78.     Marino alleges that AUI was negligent by, among other things, failing to protect the surrounding environment from contamination with, among other things, TCE, heavy metals and benzene and radioactive isotopes. (*Id*. ¶ 361).

79.     Marino further alleges that AUI breached its duty to provide him and other BNL workers with safe working conditions and to manufacture or sell TCE products in a reasonably safe manner. (*Id*. ¶¶ 364, 375. 384).

80.     Marino alleges causes of action against AUI in connection with the alleged use, marketing, sale and distribution of TCE products based on theories of strict products liability for (i) dangerously defective products; (ii) failure to warn; and (iii) abnormally dangerous activities. (*Id*. ¶¶ 412-473).

81.     Marino claims that AUI's conduct regarding BNL operational and disposal practices for, among others, TCE, heavy metals and other toxic chemicals was grossly negligent, reckless, and/or intentional and were substantial factors resulting in Marino's cancer and kidney disease (*Id*. ¶¶ 475-484).

82.     Marino further contends that AUI fraudulently concealed the hazards, dangers and risks of TCE use, contamination and exposure to human health, was motivated by AUI's goal of ensuring the renewal of its lucrative operating contract with DOE and were substantial factors resulting in Marino's cancer and kidney disease. (*Id*. ¶¶ 490-494).

83.     As a result of AUI's alleged conduct, Marino seeks $25 million in compensatory and punitive damages. (*Id*. ¶ 499).

### D.  The Yuhas Action

84.     On September 11, 2019, Ronald Yuhas ("Yuhas") filed a Verified Amended Complaint in the New York Supreme Court, naming Associated Universities, Inc., ZEP, Inc. and Dow Chemical Company ("Dow") as Defendants (the "Yuhas Action") (**Exhibit "F"**).

85.     On September 26, 2019, Dow filed a Notice of Removal with the U.S. District Court for the Eastern District of New York. (**"Exhibit "G"**).

86.     Yuhas seeks recovery from kidney disease and other injuries resulting from his alleged exposure to TCE and other substances at BNL, and specifically against AUI for legacy environmental pollution at BNL (toxic chemicals that remain polluting the land, buildings and structures at BNL after AUI ceased operation of BNL), arising from his 35 years of working at BNL for Brookhaven Science Associates ("BSA") as a computer operator, information technology shift supervisor and telecommunications technician. (Exhibit "F", ¶¶ 38-39).

87.     Yuhas claims that from 1964 to 1998, AUI employed him, and from 1998 to 2007, BSA employed him.  (*Id*.)

88.     During the course of his employment, Yuhas alleges that he used TCE cleaning solvents on a daily basis, and  as a result of his exposure to TCE, developed renal cystic disease, chronic kidney disease, COPD, Chron's disease, and other illnesses, injuries and medical problems. (*Id*.)

89.     AUI allegedly caused pervasive environmental pollution of BNL with TCE and other toxic chemicals that persisted long after DOE terminated AUI's operating contract in 1998, and AUI allegedly stockpiled TCE at BNL for use after DOE banned TCE's use in 1990. (*Id*. ¶ 40).

90.     Yuhas  alleges that AUI negligently discharged, released, discarded and disposed of TCE  and  other  toxic  substances  resulting  in  pervasive  environmental  pollution  and  toxic

contamination of buildings, structures, facilities, soils, surface water, groundwater ambient indoor air, and drinking water supplies at BNL subjecting Yuhas and other workers to dangerous risks of TCE exposure.  (*Id*. ¶ 42).

91.     Yuhas further alleges that AUI fraudulently concealed from Yuhas, among other things, that BN was dangerously polluted and contaminated with TCE and other toxic substances.  (*Id*. ¶ 43).

92.     Yuhas alleges that AUI operated BNL from 1947 to 1998, and that in 1998, due to AUI's gross neglect of its duties, DOE terminated AUI and retained  BSA to operate BNL, which has continued to do so up until the present.  (*Id*. ¶¶ 54-58).

93.     During AUI's operation of BNL, AUI engaged in activities that included the discharge, release and disposal of hazardous chemicals at BNL, including radioactive substances that were toxic to human health.  (*Id*. ¶¶64-74).

94.     In 1989, the U.S. Environmental Protection Agency declared BNL a Superfund Site due to pervasive pollution and contamination on the site.  (*Id*. ¶ 72).

95.     Among the toxins used by AUI at BNL were TCE, VOCs, heavy metals, benzene and other toxic chemicals.  (*Id*. ¶¶ 85-90).

96.     AUI used VOCs extensively at BNL from 1947 to 1998 as solvents, degreasers, cleaning and disinfecting agents, despite their known toxicity to humans.  (*Id*. ¶ 94).

97.     According to the Amended Complaint, AUI advised, instructed, directed and/or ordered workers to discharge, release, discard and dispose of TCE after use in sinks, basin and floor drains, sewers, septic sewer system, sewer pipes, cesspools, soils, trenches, shafts, holes, discharge basins and landfills.  (*Id*. ¶ 112).

98.    Despite DOE banning the use of TCE in 1990 at BNL, AUI continued to use it up until 1998 and stockpiled large quantities at BNL such that BNL workers continued to use TCE long after DOE terminated AUI's contract.  (*Id.* ¶¶ 120-121).

99.    Yuhas alleges that a 1994 engineering report described spills of TCE at BNL and levels of TCE as high as 300,000 µg/kg near one BNL building representing a potential source of groundwater contamination.  (*Id.* ¶ 138).

100.    In 2008, Yuhas was diagnosed with renal cystic disease, and was subsequently diagnosed with chronic kidney disease, COPD and Chron's disease, all of which he alleges resulted from his exposure to toxins, including, among others, TCE while working at BNL by way of inhalation, trans-dermal contact, ingestion and vapor intrusion. (*Id.* ¶¶ 194-196, 223).

101.    In 1997-98, the U.S. EPA and New York State Dep't of Environmental Conservation inspected BNL, which resulted in EPA issuing violations of federal environmental laws against AUI on March 9, 1998.  (*Id.* ¶¶  261-264).

102.    Yuhas claims that it was not until October 25, 2018, that he became aware that his alleged injuries were due to TCE exposure as a result of him identifying specific TCE-containing products used at BNL.

103.    Yuhas alleges that AUI was negligent by failing to, among other things, failing to protect the BNL environment from contamination with, among other things, TCE, VOCs and radioactive isotopes.  (*Id.* ¶ 314).

104.    Yuhas alleges causes of action against AUI in connection with the alleged use, marketing, sale and distribution of TCE products based on theories of strict products liability for (i) dangerously defective products; (ii)  failure to warn; and (iii) abnormally dangerous activities.  ((*Id.* ¶¶ 337-398).

105.    Yuhas claims that AUI's conduct regarding BNL operational and disposal practices for, among others, TCE, heavy metals and other toxic chemicals was grossly negligent, reckless, and/or intentional and were substantial factors resulting in Yuhas's alleged injuries (*Id*. ¶¶ 400-407).

106.    Yuhas further contends that AUI fraudulently concealed the hazards, dangers and risks of TCE use, contamination and exposure to human health, was motivated by AUI's goal of ensuring the renewal of its lucrative operating contract with DOE and were substantial factors resulting in Marino's cancer and kidney disease.   (*Id*. ¶¶ 414-419).

107.    As a result of AUI's alleged conduct, Marino seeks $25 million in compensatory and punitive damages.   (*Id*. ¶ 423).

**E.    PIIC's Defense of the Underlying Actions Under a Reservation of Rights**

108.    On October 16, 2019, PIIC issued a letter to AUI advising AUI that PIIC would defend the Marino Action, subject to a reservation of rights. (**Exhibit "H"**).

109.    PIIC reserved its right to deny coverage for the Marino Action on the basis, among others, that: (i) any injuries alleged by Marino did not occur during the policy period of PIIC's CGL and Umbrella Policies (Dec. 1, 2014 to Dec. 1, 2019); (ii) that Marino's injuries were not caused by an "occurrence"; (iii)  to the extent that AUI knew about Marino's injuries prior to inception of the PIIC Policies; (iv) to the extent that the Policies' pollution exclusion or expected and intended exclusion applied; and (v) "… if in the future it is shows that a covered claim does not exist with regard to any of the subject policies." (*Id*.).

110.    In connection with PIIC's offer of defense of the Mario Action subject to a reservation of rights, PIIC agreed to defend AUI by using AUI's independent counsel.

111.    On January 15, 2020,  PIIC issued a letter to AUI advising AUI that PIIC would defend the Yuhas Action, subject to a reservation of rights. (**Exhibit "I"**).

112.    PIIC reserved its right to deny coverage for the Yuhas Action on the basis, among

others, that: (i) any injuries alleged by Yuhas did not occur during the policy period of PIIC's CGL

and Umbrella Policies (Dec. 1, 2014 to Dec. 1, 2019); (ii) that Yuhas's injuries were not caused by

an "occurrence"; (iii)  to the extent that AUI knew about Yuhas's injuries prior to inception of the

PIIC Policies; and (iv) to the extent that the Policies' pollution exclusion or expected or intended

exclusion would apply. (*Id*.).

113.    In addition, PIIC continued to deny coverage, as outlined in its prior letter dated

November 13, 2019, to the extent the workers compensation and employer liability exclusions would

act to preclude coverage for the Yuhas Action.  (*Id*).

114.    In connection with PIIC's offer of defense of the Yuhas Action subject to a

reservation of rights, PIIC agreed to defend AUI by using AUI's independent counsel. (*Id*)

115.    In connection with PIIC's agreement to defend AUI under a reservation of rights,

PIIC reserved the right to deny coverage for the Yuhas Action, and advised "PIIC will participate in

the  defense of [AUI] with regard to [the Yuhas Action], but the retention of counsel shall be subject

to a reservation of rights to disclaim coverage in the future if it is shows that the clams fall outside

the insuring clause of the [PIIC Policies] or, in the alternative, fall within the purview of one or more

of the exclusions contained herein."  (*Id*.).

## COUNT I – DECLARATORY RELIEF

**(AUI's Applications for Insurance Did Not Seek Coverage From PIIC for AUI's
Discontinued Operations and TCE Products Used at Brookhaven National Lab)**

116.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if

fully stated herein at length.

117.    In the specifications that AUI submitted to PIIC for the Policies, AUI did not seek coverage from PIIC for AUI's former operations and use of TCE products at BNL.  (*See, e.g.*, Ex. "A").

118.    In the specifications that AUI submitted to PIIC for the Policies, AUI sought coverage only with regard to its management of certain telescopes that it managed for the National Radio Astronomy Observatory ("NRAO").  (*Id.*)

119.    The only AUI facility that AUI sought coverage for from PIIC was for its Washington, D.C., headquarters.  (*Id.*).

120.    The other facilities that AUI sought coverage for from PIIC was for facilities operated by NRAO and located in Arizona, California, Hawaii, Iowa, New Hampshire, New Mexico, Texas, Virgin Islands, Virginia, and West Virginia.  (*Id.*).

121.    The Specifications did not disclose that AUI formerly operated BNL, a site that at the time AUI applied for insurance with PIIC, AUI knew was heavily contaminated with TCE and other pollutants.  (*Id.*).

122.    The Specifications did not disclose that AUI had previously stored, handled or distributed TCE-containing products at BNL or at any other property.  (*Id.*).

123.    As a result, AUI did not seek coverage for AUI's discontinued operations or products exposure at BNL when it applied for insurance with PIIC.  (*Id.*).

124.    As a result, the PIIC Policies' premium schedule reflects that PIIC calculated and charged AUI premiums for operations, completed operations and products exposures only for those locations that were disclosed in the Specification and that were listed in the Policies' Location Schedule, none of which are located in New York.  (Ex. "B", CGL Supplemental Schedule, Locations Schedule).

125.    Both the CGL and Umbrella Policies contain provisions whereby AUI represented to PIIC that the statements made in the Policies' Declarations, which reference the Locations Schedule, were accurate and complete, and that PIIC issued the PIIC Policies upon reliance on AUI's representations.  (Exs. "B" & "C", Section IV, Conditions).

126.    Since AUI sought coverage only for those locations disclosed in the Specifications, and all subsequent specifications AUI submitted to PIIC for coverage, and since PIIC charged and collected premiums only for those locations disclosed in the specifications, none of the PIIC Policies affords coverage for the operations, completed operations or products exposure at BNL.

127.    Accordingly, there is no coverage under the PIIC Policies for the Underlying Actions.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.    Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.    Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.    Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## <u>COUNT II – DECLARATORY RELIEF</u>

**( Brookhaven National Lab is Not a Schedule Location on the PIIC Policies)**

128.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

129.     In the specifications that AUI submitted to PIIC for the Policies, AUI did not seek coverage from PIIC for BNL located in Upton, New York.

130.     In fact, in the specifications that AUI submitted to PIIC for the Policies, AUI did not seek coverage from PIIC for any properties or locations in New York.

131.     In the specifications that AUI submitted to PIIC for the Policies, AUI sought coverage only with regard to its management of certain telescopes that it managed for the National Radio Astronomy Observatory ("NRAO").

132.     The only AUI facility that AUI sought coverage for from PIIC was for its Washington, D.C., headquarters.

133.     The other facilities that AUI sought coverage for from PIIC was for facilities operated by NRAO and located in Arizona, California, Hawaii, Iowa, New Hampshire, New Mexico, Texas, Virgin Islands, Virginia, and West Virginia.

134.     As a result, the PIIC Policies' premium schedule reflects that PIIC calculated and charged AUI premiums only for those locations that were disclosed in the Specification and that were listed in the Policies' Location Schedule, none of which are located in New York.  (Ex. B., CGL Supplemental Schedule, Locations Schedule).

135.     Both the CGL and Umbrella Policies contain provisions whereby AUI represented to PIIC that the statements made in the Policies' Declarations, which reference the Locations Schedule, were accurate and complete, and that PIIC issued the PIIC Policies upon reliance on AUI's representations.  (Exs. "B" & "C", Section IV, Conditions).

136.     Since AUI sought coverage only for those locations disclosed in the Specifications, and all subsequent specifications AUI submitted to PIIC for coverage, and since PIIC charged and

collected premiums only for those locations disclosed in the specifications, none of the PIIC Policies affords coverage for the operations, completed operations or products exposure at BNL.

137.    Accordingly, there is no coverage under the PIIC Policies for the Underlying Actions.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.    Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.    Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.    Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## <u>COUNT III – DECLARATORY RELIEF</u>

**(Insuring Agreement – Bodily Injuries Manifested Prior to the 2014 Policy Period)**

138.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

139.    The Insuring Agreement of the PIIC Policies provides coverage for damages because of bodily injury, but only if the bodily injury occurs during the "policy period".

140.    The CGL Policies Insuring Agreement provides in pertinent part that:

> b.    This insurance applies to "bodily injury" and "property damage" only if:
>
> * * *
>
> (2) the "bodily injury" and "property damage" occurs during the policy period; and

(*See* Ex. "B",  CG 00 01 12 07 at p. 1).

141.     The Umbrella Policies' Insuring Agreement provides in pertinent part that "This insurance applies to "bodily injury" or "property damage" only if … [t]he "bodily injury" or "property damage" occurs during the policy period …."  (Ex. "C"., PI-CXL-001 (03/14, p. 1)

142.     The first PIIC CGL and Umbrella Policies incepted on December 1, 2014.

143.     Marino alleges that his injuries were diagnosed on March 10, 2009 (Ex. E, ¶ 210).

144.     Yuhas alleges that his injuries were diagnosed in 2008.  (Ex. F, ¶ 194).

145.     The injuries of both Marino and Yuhas therefore manifested prior to the inception of PIIC's Policies.

146.     For purposes of determining coverage under the PIIC Policies, the alleged bodily injuries alleged by Marino and Yuhas ended when their respective injuries manifested.

147.     As a result, the allegations in the Underlying Actions are not actually or potentially covered by the PIIC Policies.

148.     Accordingly, PIIC has no duty to defend or indemnify AUI against the Underlying Actions pursuant to the PIIC Policies.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.     Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.     Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.      Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## COUNT IV - DECLARATORY RELIEF

### (Reimbursement of Defense Fees and Costs)

149.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

150.    The CGL Policies provide in pertinent part that "[PIIC] will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, [PIIC] will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."  (Ex. "B",  CG 00 01 12 07 at p. 1).

151.    In addition, in connection with PIIC's agreement to defend AUI under a reservation of rights, PIIC reserved the right to deny coverage for the Marino Action if, among other things, "…in the future it is shown that a covered claim does not exist with regard to any of the subject policies. (Ex. "H").

152.    In connection with PIIC's agreement to defend AUI under a reservation of rights, PIIC reserved the right to deny coverage for the Yuhas Action, and advised "PIIC will participate in the  defense of [AUI] with regard to [the Yuhas Action], but the retention of counsel shall be subject to a reservation of rights to disclaim coverage in the future if it is shows that the clams fall outside the insuring clause of the [PIIC Policies] or, in the alternative, fall within the purview of one or more of the exclusions contained herein."  (Ex. "I").

153.    To the extent that CGL Policies do not apply to the damages alleged in the Underlying Action, there is no duty to defend the Underlying Action pursuant to the CGL Policies' Insuring Agreement.

154.     The fact that the CGL Policies duty to defend applies only to covered damages creates an implied contractual obligation to reimburse PIIC if it is determined that no defense obligation is in fact owed under the Policies.

155.     In its reservation letters, PIIC advised AUI that it was reserving its rights to deny coverage if in the future, it was determined that coverage did not exist under the PIIC Policies.

156.     To the extent that PIIC has conferred a benefit upon AUI that was no owed under the Policy, AUI is contractually bound to reimburse PIIC for defense fees and costs incurred to date.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.     Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.     Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.     Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## <u>COUNT V - DECLARATORY RELIEF</u>

### **(Bodily Injuries Were Not Caused by an Occurrence)**

157.     PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

158.    The CGL Policies' Insuring Agreement provides in pertinent "This insurance applies to "bodily injury" and "property damage" only if … the "bodily injury" or "property damage" is caused by an "occurrence" …."  (Ex. "B",  CG 00 01 12 07 at p. 1).

159.    The CGL Policies define "occurrence" as "… an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id*. p. 15).

160.    The Umbrella Policies' Insuring Agreement provides in pertinent part that it applies only if "'bodily injury' or 'property damage" arising out of an 'occurrence' takes place in the 'coverage territory'".  (Ex. "C", PI-CXL-001 (03/14, p. 1).

161.    The Umbrella Policies define "occurrence" as "… an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id*. p. 26).

162.    Both the CGL and Umbrella Policies exclude coverage for "bodily injuries" that are expected or intended from the standpoint of an insured.  (Ex. "B". CG 00 01 12 07 at p.2; Ex. "C"., PI-CXL-001 (03/14), p. 4).

163.    In both Underlying Actions, Marino and Yuhas allege that their injuries were not due to accidental conduct by AUI, but rather, were due to willful and intentional conduct warranting punitive damages.  (Ex. "E" ¶¶ 475-484; Ex. "F" ¶¶ 400-407).

164.    As a result, the Underlying Actions allege injuries that were not caused by an "occurrence" or were expected or intended by AUI.

165.    To the extent that Marino and Yuhas's injuries were not caused by an "occurrence" or were expected or intended by AUI, there is no coverage for such injuries under the PIIC Policies.

166.    Accordingly, PIIC has no duty to defend or indemnify AUI against the Underlying Actions pursuant to the PIIC Policies.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.      Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.      Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.      Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## COUNT VI– DECLARATORY RELIEF

**(AUI's Knowledge that "bodily injury" or "property damage" had occurred, in whole or in part, prior to the PIIC policy periods precludes coverage for the Underlying Actions)**

167.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

168.    The Insuring Agreement for the CGL Policies provides in pertinent part that the insurance applies to "bodily injury" or "property damage" only if:

> (3) Prior to the policy period, no insured listed under Paragraph **1**. of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

* * *

   d.  "Bodily injury" or "property damage" will be deemed to
have been known to have occurred at the earliest time when
any insured listed under Paragraph **1**. of Section **II** – Who
is An Insured or any "employee" authorized by you to give
or receive notice of an "occurrence" or claim:

    (1)  Reports all, or any part, of the "bodily injury" or
"property damage" to us or any other insurer;

    (2)  Receives a written or verbal demand or claim for
damages because of the "bodily injury" or "property
damage"; or

    (3)  Becomes aware by any other means that "bodily injury"
or "property damage" has occurred or has begun to
occur.

(Ex. "B". CG 00 01 12 07 at p. 1)

169.    The Umbrella Policies contain substantially similar provisions as the CGL Policies

whereby the Umbrella Policies do not apply if prior to the policy period, an insured is aware that

"bodily injury" or "property damage" had occurred.  (Ex. "C", PI-CXL-001 (03/14), pp. 1-2).

170.    In the Underlying Actions, Marino and Yuhas allege that AUI was aware of reports

identifying pervasive TCE contamination at BNL, TCE's toxic health effects on workers, the DOE

had banned the use of TCE at its facilities and AUI had been cited by the U.S. EPA under various

environmental statutes.  (Ex. "E", ¶¶ 86, 72, 133, 135-36, 48-163; Ex. "F", ¶¶ 12-121, 138, 261-

264).

171.    Based on information and belief, prior to December 1, 2014, AUI was aware that its

former employees as well as other DOE subcontractor employees and former employees had made

claims under the DOL EEOICP as a result of alleged exposure to toxins while working at BNL.

172.     Thus, prior to the inception of the first PIIC Policies, December 1, 2014, AUI was aware that property damage and bodily injury had occurred at BNL and that the bodily injury and property damage was due to TCE exposure and other chemicals it supplied to its workers at BNL.

173.     To the extent that AUI was aware that bodily injury and property damage had occurred in whole or in part, prior to inception of the PIIC Policies, there is no coverage under the PIIC Policies for the Underlying Action pursuant to the Policies' respective Insuring Agreements.

174.     Accordingly, PIIC has no duty to defend or indemnify AUI under the PIIC Policies for the Underlying Actions.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.     Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.     Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.     Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## COUNT VII– DECLARATORY RELIEF

**(The Pollution Exclusion Precludes Coverage for the Underlying Actions)**

175.     PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

176.     The Underlying Actions allege that TCE and other pollutants and contaminants were discharged and released at BNL by AUI.  (Ex. "E", ¶¶ 77-79, 81, 126, 148-163; Ex. "F", ¶¶ 42, 64-74, 112),

177.     Both Marino and Yuhas allege that their injuries were caused by exposure to TCE and other pollutants or contaminants.  (Ex. "E", ¶¶ 194, 215, 316; Ex. "F", ¶¶ 38-39, 194-96, 223).

178.     The CGL Policies contain a Pollution Exclusion that precludes coverage for "bodily injury" "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' … [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured  [or] … [a]t or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste. ( Ex. "B". CG 00 01 12 07 at pp. 3-4).

179.     The Umbrella Policies contain a Pollution Exclusion that is substantially similar to the one set forth in the CGL Policies.   (Ex. "C"., PI-CXL-001 (03/14) pp. 9-10).

180.     TCE and the other chemicals and substances allegedly discharged by AUI and BNL and that allegedly caused injuries to Marino and Yuhas are "pollutants" within the meaning of the PIIC Policies.  (Ex. "B" CG 00 01 12 07 at p. 15 ; Ex. "C", PI-CXL-001 (03/14) p. 26).

181.     Since Marino and Yuhas both allege that their injuries arose out of the discharge and release of "pollutants," the Pollution Exclusion in the PIIC Policies precludes coverage for the Underlying Actions in their entirety.

182.     Accordingly, PIIC has no duty to defend or indemnify AUI under the PIIC Policies in connection with Underlying Actions.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.      Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection

with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain

reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the

Underlying Actions;

B.      Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection

with the Underlying Actions; and

C.      Grant any other relief that this Honorable Court deems just and equitable under the

circumstances, including the award of costs.

## COUNT VIII– DECLARATORY RELIEF

**(Lack of Fortuity and Know Loss/Loss in Progress Precludes Coverage)**

183.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if

fully stated herein at length.

184.    In order for coverage to be afforded under any liability policies, the liability of an

insured must be fortuitous.

185.    In order for coverage to be afforded under any liability policies, the insured must be

unaware that a loss has occurred or is in progress prior to inception of the insurance policies.

186.    In the Underlying Actions, Marino and Yuhas allege that AUI was aware of reports

identifying pervasive TCE contamination at BNL, TCE's toxic health effects on workers, the DOE

had banned the use of TCE at its facilities and AUI had been cited by the U.S. EPA under various

environmental statutes.  (Ex. "E", ¶¶ 86, 72, 133, 135-36, 48-163; Ex. "F", ¶¶ 12-121, 138, 261-

264).

187.    Based on information and belief, prior to December 1, 2014, AUI was aware that its former employees as well as other DOE subcontractor employees and former employees had made claims under the DOL EEOICP as a result of alleged exposure to toxins while working at BNL.

188.    Thus, prior to the inception of the first PIIC Policies, December 1, 2014, AUI was aware that property damage and bodily injury had occurred at BNL and that the bodily injury and property damage was due to TCE exposure and other chemicals it supplied to its workers at BNL.

189.    To the extent that AUI was aware that bodily injury and property damage had occurred prior to inception of the PIIC Policies, there is no coverage under the PIIC Policies for the Underlying Action since the damages and injuries complained of in the Underlying Actions are not fortuitous and are also precluded pursuant to the known loss doctrine or injury-in-progress doctrine.

190.    Accordingly, PIIC has no duty to defend or indemnify AUI under the PIIC Policies for the Underlying Actions.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.    Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Underlying Actions, may withdraw from its defense of the Underlying Actions, and obtain reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Underlying Actions;

B.    Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Underlying Actions; and

C.    Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

## COUNT IX– DECLARATORY RELIEF

**(The Workers Compensation and Employee Exclusions Preclude Coverage for the Yuhas Action)**

191.    PIIC incorporates by reference the preceding paragraphs of its Complaint above as if fully stated herein at length.

192.    The CGL Policies contain exclusions that preclude coverage for any obligation of an insured under workers compensation, disability benefits or similar law, as well as bodily injury to an insured employee arising out of and in the course of employment by the insured.   ( Ex. "B" CG 00 01 12 07 at p 2.)

193.    The Umbrella Policies contain workers compensation and employer liability exclusions. Ex. "C", PI-CXL-001 (03/14) pp. 4-5).

194.    Yuhas alleges that he was employed by AUI during the years 1964 to 1998. (Ex. "F", ¶¶ 38-39).

195.    Yuhas alleges that his injuries arose out of his workplace exposure to TCE.  Ex. "F", ¶¶ 38-39, 194-96, 223

196.    Yuhas's claims for injuries to exposure to TCE while employed by AUI fall squarely within the PIIC Policies' Workers Compensation and Employers Liability Exclusions.

197.    As a result, PIIC has no duty to defend or indemnify AUI for the Yuhas Action pursuant to the Workers Compensation and Employers Liability Exclusions.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY, respectfully requests this Honorable Court to declare and adjudge the controversy as follows:

A.    Declare that PIIC has no duty to defend AUI under the PIIC Policies in connection with the Yuhas Action, may withdraw from its defense of the Yuhas Action, and obtain

reimbursement from AUI for defense fees and costs PIIC has paid to date in defending the Yuhas Action;

B.      Declare that PIIC has no duty to indemnify AUI under the PIIC Policies in connection with the Yuhas Action; and

C.      Grant any other relief that this Honorable Court deems just and equitable under the circumstances, including the award of costs.

**WHEREFORE**, Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY prays that this Honorable Court enter a judgment and declare that PIIC has no obligation to defend or indemnify Defendant Associated Universities, Inc. against the Marino and the Yuhas Actions, and grant PIIC any other and relief that this Court deems just and proper, including fees and costs.

Respectfully submitted,

_/s/ Kathryn E. Bonorchis_
Kathryn E. Bonorchis (VSB #80007)
Lewis, Brisbois, Bisgaard & Smith, LLP
100 Light Street, Suite 130
Baltimore, Maryland 21202
Telephone: 410-525-6409
Fax: 410-779-3910
Email: Kathryn.Bonorchis@lewisbrisbois.com
*Attorneys for Plaintiff*