# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, <br> *Plaintiff*, <br><br> v. <br><br> ASSOCIATED UNIVERSITIES, INC., *et al.*, <br> *Defendants.* | CASE NO. 3:20-cv-47 <br><br> <u>MEMORANDUM OPINION & ORDER</u> <br><br> JUDGE NORMAN K. MOON |

Plaintiff Philadelphia Indemnity Insurance Company ("PIIC") filed a complaint against Defendants Associated Universities, Inc. ("AUI"), Joseph Marino, and Ronald Yuhas, seeking a declaratory judgment that PIIC has no duty to defend or indemnify its insured, AUI, in Marino and Yuhas's lawsuits against AUI alleging bodily injury resulting from their exposure to trichloroethylene ("TCE") at the Brookhaven National Laboratory ("BNL") in Upton, New York. Dkt 1. Defendant AUI filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 6. For the reasons below, the Court will grant in part and deny in part AUI's motion to dismiss PIIC's claims regarding its duty to defend AUI and will deny AUI's motion to dismiss PIIC's claims regarding its duty to indemnify AUI.

## I.    ALLEGED FACTUAL BACKGROUND

For the purposes of ruling on the motion to dismiss, the Court must accept as true the well-pleaded allegations set forth in the complaint.

### A.    Associated Universities, Inc.'s Insurance Policies

In October 2014, the insurance broker for AUI submitted a "Specifications of Insurance" document to PIIC describing AUI's operations, locations, and types of insurance that AUI sought

to acquire. Dkt. 1 ¶¶ 10–11; 1-1. The Specifications noted that AUI was an educational institution created in 1946 for research, development, and education in the physical, biological, and engineering sciences, and that its charter was to "acquire, plan, construct and operate laboratories and facilities that would unite the resources of universities, research organizations and the Federal Government." Dkt. 1 ¶¶ 12–13; Dkt. 1-1.

Since 1956, AUI has managed the National Radio Astronomy Observatory ("NRAO") for the National Science Foundation. Dkt. 1 ¶ 14. At its headquarters in Charlottesville, Virginia, the NRAO designs, builds, and operates high-sensitivity telescopes. *Id.* ¶ 15. According to the Specifications, AUI sought commercial property coverage for certain personal property at AUI-managed facilities in Virginia, West Virginia, Washington, D.C., and New Mexico, which were limited to operations relating to radio telescopes and observatories. *Id.* ¶¶ 17–18. The Specifications also contained a schedule of locations for AUI and NRAO; neither included any facilities in New York. *Id.* ¶ 19. An "Extensions of Coverage" section sought enhancements of coverage based on industry endorsements. *Id.* ¶ 20. It did not list any endorsement or enhancement for locations that AUI no longer managed or at which AUI had discontinued operations. *Id.* ¶ 21. Finally, the Specifications sought Commercial Property Coverage, Commercial General Liability ("CGL") coverage, and Commercial Umbrella Liability ("Umbrella") coverage. *Id.* ¶ 26.

From December 2014 to December 2020, PIIC issued AUI and NRAO annual Commercial Package Policies including CGL Policies and Umbrella Policies. *Id.* ¶¶ 27–30. Until 2019, AUI and NRAO submitted to PIIC annual specifications that were substantially similar to the initial Specifications. *Id.* ¶ 31. None of the specifications ever identified any locations within New York, including the Brookhaven National Laboratory ("BNL"), as a location for which AUI

or NRAO sought insurance from PIIC. *Id.* ¶¶ 32–33. The specifications did not disclose that AUI had managed BNL from 1946 to 1998 for the U.S. Department of Energy ("DOE"), nor did they state that AUI sought insurance coverage for its discontinued operations at BNL. *Id.* ¶¶ 34–35.

The Declarations page for the CGL policies that PIIC provided to AUI identifies AUI as a "Non Profit Organization" and contains a Location Schedule listing 16 locations, none of which are in New York. *Id.* ¶¶ 38–40. In addition, the CGL policies' Supplemental Schedule listing the premium for each insured location does not refer to or include any property in New York. *Id.* ¶¶ 41–42.

The CGL Policies' Insuring Agreement described PIIC's duty to defend AUI against lawsuits seeking damages because of "bodily injury" to which the insurance applied. *Id.* ¶ 43. The agreement stated that the insurance applied to "bodily injury" only if:

> (1) The "bodily injury" . . . is caused by an "occurrence" that takes place in the "coverage territory";
> (2) The "bodily injury" . . . occurs during the policy period; and
> (3) No listed insured or authorized employee of AUI knew prior to the policy period that the "bodily injury" had occurred.

*Id.* The agreements further provided that AUI would be deemed to have known that a "bodily injury" had occurred at the earliest time when any insured or authorized employee "(1) [r]eports . . . the 'bodily injury' . . . to us or any other insurer; (2) [r]eceives a written or verbal demand or claim for damages because of the 'bodily injury' . . . ; or (3) [b]ecomes aware by any other means that 'bodily injury' . . . has occurred or has begun to occur." *Id.*

The policies defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* They defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*

The policies excluded insurance coverage for "'[b]odily injury' . . . expected or intended from the standpoint of the insured," "[a]ny obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law . . . ," "'[b]odily injury' to . . . [a]n 'employee' of the insured arising out of an[d] in the course of (a) [e]mployment by the insured . . . ," and "'[b]odily injury' . . . arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'" *Id.* ¶ 44.

Finally, the CGL Policies included a Representations clause stating that AUI's acceptance of the policy constitutes its agreement that the statements in the Declarations are accurate and complete, that the statements in the Declarations are based on AUI's representations to PIIC, and that PIIC issued the insurance in reliance on those representations. *Id.* ¶ 45.

The Umbrella Policies contained similar definitions, exclusions, and disclaimers. *Id.* ¶¶ 46–47, 49. In addition, they stated that PIIC "will have no duty to defend the insured against any claim or 'suit' that any other insurer has a duty to defend." *Id.* ¶ 48.

### B.     TCE Exposure Lawsuits Against AUI

#### 1.     Marino's Lawsuit (*Marino v. Brookhaven Science Associates, LLC, et al.*, No. 2:19-cv-04839, E.D.N.Y.)

In July 2019, Marino filed a complaint naming AUI as a defendant and alleging the following facts. *Id.* ¶¶ 50–52.

From 1947 to 1998, AUI contracted with the DOE to operate and manage BNL, an atomic, nuclear, and high-energy physics, chemical, and biological research facility. *Id.* ¶¶ 53, 57. Marino alleged that he used trichloroethylene ("TCE") in aerosol form while working at BNL from 1999 to 2000 as a computer technician for Carlyle Technical Services and Entex. *Id.* ¶¶ 54, 64, 68. AUI negligently supplied, directed, and instructed him to use TCE during his work

without giving warnings about the dangers of exposure or protection against such exposure. *Id.* ¶ 55. As a result, Marino inhaled, touched, and ingested hazardous levels of TCE. *Id.* ¶ 69.

In addition, AUI directed workers to discard used TCE into sinks, basins, floor drains, sewers, septic systems, soils, and landfills. *Id.* ¶ 65. AUI also discharged, released, and disposed of radioactive fuels, toxic chemicals, and substances known as human health hazards, resulting in severe and pervasive pollution and environmental contamination. *Id.* ¶¶ 59–60, 67.

In 1989, the U.S. Environmental Protection Agency ("EPA") declared BNL a Superfund Site. *Id.* ¶ 61. DOE banned use of TCE at its facilities in 1990, but AUI stockpiled it at BNL for future use, and Marino continued to use it beyond 2006. *Id.* ¶ 66. The EPA issued violation notices to AUI in 1998 for violating federal environmental laws. *Id.* ¶ 73. Marino alleged that AUI fraudulently concealed the presence of TCE in the buildings, structures, facilities, soils, surface waters, groundwaters, ambient indoor air, and drinking water. *Id.* ¶ 56.

Marino was diagnosed with carcinoma in his right kidney in 2009 and chronic kidney disease in his left kidney in 2018. *Id.* ¶¶ 70–71. Although he did not know until 2016 that his TCE exposure caused his kidney cancer, his TCE exposure over time caused both his kidney cancer and chronic kidney disease. *Id.* ¶¶ 72, 74. In 2017, Marino submitted a claim for benefits under the U.S. Department of Labor's ("DOL") Energy Employees Occupational Illness Compensation Program Part E; in 2018, DOL recognized his claim, finding that his occupational exposures at BNL caused his cancer. *Id.* ¶¶ 75–76.

Marino has sued AUI for negligence, strict products liability, intentional tortious conduct, and fraudulent concealment. *Id.* ¶¶ 78–82. He seeks $25 million in damages. *Id.* ¶ 83.

> 2. **Yuhas's Lawsuit (*Yuhas v. Associated Universities, Inc., et al.*,**
> **No. 2:19-cv-05475, E.D.N.Y.)**

In September 2019, Yuhas filed a complaint naming AUI as a defendant. *Id.* ¶¶ 84–85.

His complaint is substantially similar to Marino's complaint except for the following alleged

facts.

Yuhas worked as a computer operator, information and telecommunications technician at

BNL for AUI from 1964 to 1998 and for Brookhaven Science Associates ("BSA") from 1998 to

2007. *Id.* ¶ 87. Yuhas used TCE on a daily basis at work. *Id.* ¶ 88. Even though DOE banned

TCE use at BNL in 1990, AUI continued to use TCE there until 1998 and stockpiled TCE in

such large amounts that BNL workers, including Yuhas, continued to use it after 1998. *Id.* ¶ 98.

In 2008, Yuhas was diagnosed with renal cystic disease. *Id.* ¶ 100. Later, he was

diagnosed with chronic kidney disease, COPD, and Crohn's disease. *Id.* ¶. On October 25, 2018,

Yuhas learned that his injuries were due to his exposure to TCE, which he inhaled, touched, and

ingested while working at BNL. *Id.* ¶¶ 100, 102.

Yuhas has sued AUI for negligence, strict products liability, intentional tortious conduct,

and fraudulent concealment. *Id.* ¶¶ 103–106. He seeks $25 million in damages. *Id.* ¶ 107.

## C. PIIC's Defense of AUI in the TCE Actions

On October 16, 2019, PIIC advised AUI that PIIC would defend Marino's lawsuit subject

to a reservation of its right to deny coverage:

> (1) If any of Marino's alleged injuries did not occur during the policy period starting on
>     December 1, 2014;
> (2) If Marino's injuries were not caused by an "occurrence";
> (3) To the extent that AUI knew about Marino's injuries before the policies began;
> (4) To the extent that the pollution exclusion or expected and intended exclusion applied;
>     and
> (5) "[A] covered claim does not exist with regard to any of the subject policies."

*Id.* ¶¶ 108–09.

6

On January 15, 2020, PIIC advised AUI that PIIC would defend Yuhas's lawsuit subject

to a reservation of its right to deny coverage:

I.    If any of Yuhas's alleged injuries did not occur during the policy period starting on December 1, 2014;
II.   If Yuhas's injuries were not caused by an "occurrence";
III.  To the extent that AUI knew about Yuhas's injuries before the policies began;
IV.   To the extent that the pollution exclusion or expected and intended exclusion applied; and
V.    To the extent that the workers compensation and employer liability exclusions would preclude coverage.

*Id.* ¶¶ 111–13.

## II.   LEGAL STANDARD

### A.   Failure to State a Claim Under Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal

sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the

complaint taken as true and all reasonable inferences drawn in the plaintiff's favor.

*King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however,

resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses." *Id*. at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's

obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."). A court need not "accept the legal conclusions drawn from the facts" or "accept as

true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). And the court cannot "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics"; instead, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### B.      Failure to State a Claim Under Rule 12(b)(1)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) tests a court's subject matter jurisdiction over a claim.  The district court should grant a Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991)) (internal quotation marks omitted). The plaintiff has the burden of establishing subject matter jurisdiction. *Demetres v. E.W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

### III.      ANALYSIS

### A.      Law Governing the Interpretation of the Policies

A federal court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Accordingly, Virginia choice-of-law rules apply. In insurance coverage disputes, the general rule in Virginia is that "the law of the place where an insurance contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) (citation omitted).

The complaint alleges that the insurance contracts were delivered in Virginia. Dkt. 1 ¶ 8. Although AUI "reserves the right to demonstrate that the law of a different jurisdiction controls if a conflict between the laws of different states will have a material effect on the outcome,"[1] Dkt. 7 at 12 n.6, both parties assume that Virginia law applies in making their arguments. Therefore, the Court will apply Virginia law to all claims.

### B.      Claims Regarding Duty to Defend

In considering whether an insurer has a duty to defend, Virginia courts apply the "Eight Corners Rule," which requires courts to "compar[e] the 'four corners' of the underlying complaint with the 'four corners' of the policy[] to determine whether the allegations in the underlying complaint come within the coverage provided by the policy." *See AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 535 (Va. 2012).

"Virginia courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document." *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 354 (Va. 2019) (quotation marks and citations omitted). "[E]very word, clause, and provision of the policy should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein." *Id.* at 355 (quotation marks and citations omitted).

---

[1] For example, AUI notes that the policies became effective when countersigned by PIIC, presumably located in Pennsylvania, so Pennsylvania law might control. Dkt. 7 at 12 n.6. PIIC insists that Virginia law controls because Virginia Code § 38.2-223 indicates that the countersignature provision is invalid, so delivery occurred in Virginia. Dkt. 23 at 12–13. AUI also mentions that PIIC argued that New York law should govern in prior communications with AUI. *Id.*

"The insured has the initial burden to establish a duty to defend, but this burden is not onerous because principles of insurance law in Virginia . . . are solicitous of insureds." *Liberty Univ. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir. 2015) (quotation marks and citation omitted). "[A]mbiguous terms in a policy are construed against the insurer, who wrote the policy and presumably could have written it more clearly." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009). Similarly, "doubts over coverage are typically to be resolved in favor of the policyholder and against a limitation of coverage." *Id.* (citing *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989)).

Furthermore, an "insurer's obligation to defend is broader than its obligation to pay." *Id.* (citing *Brenner v. Lawyers Title Ins. Corp.*, 397 S.E.2d 100, 102 (Va. 1990). "[W]hile . . . the duty to indemnify relies on litigated facts," *id.* at 154, the duty to defend arises "whenever the [underlying] complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *Liberty Univ.*, 792 F.3d at 528 (quoting *AES*, 725 S.E.2d at 535) (quotation marks omitted). "[W]hen a complaint's allegations could support alternative theories of liability . . . the insurer has a duty to defend the policyholder against all claims," even if only one of the theories falls within the coverage agreement. *Id.* (citing *Parker v. Hartford Fire Ins. Co.*, 278 S.E.2d 803, 804 (Va. 1981)). But "if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations, it has no duty even to defend." *Id.* at 529 (quoting *AES*, 725 S.E.2d at 536–38) (quotation marks omitted).

"If the insured demonstrates that the complaint alleges a covered injury, the burden shifts to the insurer to show that the policy's exclusionary language . . . clearly and unambiguously brings the particular alleged act or omission within its scope." *Id.* (quoting *Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)) (quotation marks and alterations omitted).

### 1. Claims Asserting That Policies Did Not Contemplate Coverage for Former/Discontinued Operations and Non-Scheduled Locations (Counts I and II)

Count I seeks a declaration that AUI did not seek coverage from PIIC for AUI's discontinued operations and TCE products used at BNL. Dkt. 1 ¶¶ 117, 123. Count II seeks a declaration that AUI did not seek coverage from PIIC for BNL but rather only for locations and facilities disclosed in AUI's Specifications and listed in the Policies' Location Schedule. *Id.* ¶¶ 129–136.

AUI argues that these Counts must fail because PIIC alleges neither that a provision in the Policies limits coverage to liabilities arising from AUI's present operations at certain locations, nor that a term or exclusion limits coverage to liabilities arising out of locations listed in the Schedule of Locations.[2] Dkt. 7 at 14–17; Dkt. 24 at 3–8. Instead, AUI argues, the plain terms of the Insuring Agreement as alleged define the scope of CGL coverage and require PIIC to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Dkt. 1 ¶ 43.[3] AUI also

---

[2] AUI argues that the Locations Schedule, which is referenced only in the Designated Locations General Aggregate Limit endorsement section of the Policies, "affects only the *amount* of coverage, as it provides a separate *per location* aggregate limit that PIIC will pay in the event of damage claims 'attributed only to operations at a single designated "location."'" Dkt. 24 at 5 (emphasis in original).

[3] AUI also argues that other language in the Policies supports its contention that the Policies' coverage is not limited to the scheduled locations. Dkts. 7 at 17; 24 at 6–7. For example, the inclusion of products-completed operations coverage, which covers liabilities arising from activities that do not occur on AUI's premises, in the Aggregate Limit endorsement section shows that the parties intended that coverage not be limited to the scheduled locations. Dkts. 7 at 17; 24 at 6. In addition, the Policies' pollution exclusion, which excludes injury "[a]t or from any premises, site or location *which is or was at any time* owned or occupied by, or rented or loaned to, any insured" shows that the scope of coverage extends to liabilities from former locations, since language excluding coverage for pollution liabilities arising from previously-owned or -operated property would be unnecessary unless such liabilities were within the scope of coverage by default. Dkt. 24 at 7 (emphasis in original).

contends that PIIC has not alleged that the Policies terms are ambiguous, and that in the absence of ambiguity, the court must look only to the Policies' language to determine the contracting parties' intent.

PIIC counters that a policy does not need to exclude risks that the parties never contemplated and never intended to cover, and that the court may consider AUI's representations in the Specifications—which the CGL policy explicitly references—in interpreting the Policies and discerning the parties' intent regarding the scope of coverage.[4] Dkt. 23 at 15–22.

PIIC relies on *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773 (7th Cir. 2015), in which the Seventh Circuit held that an insurance agreement under Illinois law provided coverage only for the policyholder's construction-related business, not for injuries that occurred on a chartered yacht for which the policyholder was a booking agent. In that case, the policies' declarations listed the policyholder's business as "concrete construction," and the general liability schedule explained that the insurer was providing coverage for work done "in connection with construction, reconstruction, repair or erection of buildings." *Id.* at 778. Thus, the text of the policies "reflect[ed], explicitly, the parties' intent to insure only [the policyholder's] construction business." *Id.*

The Seventh Circuit also examined the insured's representations in the insurance application, since the policies provided that the insured "agreed that '[t]he statements in the Declarations are accurate and complete,' that '[t]hose statements are based upon representations' [the insured] made to [the insurer], and that [the insurer] "issued th[e] policy in reliance upon [those] representations.'" *Id.* at 778–79. The insurance application stated that the policyholder was in the "construction business," and the schedule of hazards—listing the risks the parties

---

[4] PIIC does not allege that AUI's representations were false or inaccurate.

intended to cover—included "concrete construction," "Contractors Executive Supervisors," and "subcontractors." *Id.* at 779. Taken together, "the business designation *and* the general liability schedule contained in the contract, as well as the incorporated representations in the insurance application, express, *uniformly*, the parties' intent to limit the scope of the insurance policies to [the policyholder's] known business, construction." *Id.* (emphasis in original). Ultimately, the *Westfield* court concluded that "[a] policy does not need to exclude from coverage liability that was not contemplated by the parties and not intended to be covered under their agreement." *Id.*

As discussed above, Virginia courts generally apply the Eight Corners Rule and examine only the terms of the insurance policy and the allegations in the underlying complaint to determine whether the insurer has a duty to defend the insured. However, at least one court applying Virginia law in a duty to defend case has also examined the terms of an insurance application incorporated into an insurance policy. *See KitBar Enters., LLC v. Liberty Ins. Underwriters, Inc.*, 291 F. Supp. 3d 758, 765 (E.D. Va. 2018) (pointing to language in the insurance application that stated "if a policy is issued this application will form part of such policy and [the insurer] will be relying on the completeness and accuracy of the statements and disclosures in this application"). In *KitBar*, the "plain language of the insurance application," *id.* at 766, "required [the insured] to disclose any knowledge or information of any circumstances that might give rise to a claim under the proposed policy," and "explicitly excluded from coverage . . . any losses arising from matters which should have been disclosed," *id.* at 765. Because the undisputed record evidence showed that the insured knew about but failed to disclose a lawsuit filed against it when it submitted the insurance application, the court held on summary judgment that the lawsuit was excluded from coverage, and the insurer had no duty to defend the insured in the lawsuit. *Id.* at 765–66.

13

Here, PIIC alleges that the Policies contain language stipulating that AUI's acceptance of the policy constitutes its agreement that "[t]he statements in the Declarations are accurate and complete," that "[t]hose statements are based upon representations [AUI] made to [PIIC]," and that PIIC "issued the policy in reliance upon [AUI's] representations." *Id.* ¶ 45; *see also id.* ¶¶ 125–26, 135–36. This language is nearly identical to the policy language in *Westfield* incorporating the policyholder's representations in the insurance application into the policy, 796 F.3d at 778–79, and very similar to the insurance application language in *KitBar* incorporating the policyholder's statements and disclosures into the policy, 291 F. Supp. 3d at 765. PIIC's alleged facts are sufficient to support a reasonable inference that the Policies incorporate AUI's representations in the Specifications. Thus, the Court will consider PIIC's allegations about both the text of the Policies and AUI's representations in the Specifications in determining whether PIIC has stated a plausible claim regarding the parties' intent to cover AUI's former operations and facilities at BNL.

PIIC alleges that the Policies' Declarations list AUI's business as "Non Profit Organization," Dkt. 1 ¶ 38, and contain a Location Schedule listing 16 locations, none of which are in New York, *id.* ¶¶ 39–40. PIIC further alleges that the Specifications stated that AUI was in the business of research, development, and education in the physical, biological, and engineering sciences, and that it operated laboratories and facilities. *Id.* ¶¶ 12–13. However, the Specifications did not specifically mention AUI's former operations at BNL or that AUI knew BNL was contaminated with TCE, even though the Specifications described other operations and facilities in detail. *Id.* ¶¶ 22–24, 34–35, 121–22.

PIIC also alleges that AUI's Specifications did not seek coverage for BNL or any New York locations. *Id.* ¶¶ 19, 32–33, 124, 129–30. Instead, PIIC alleges that the Specifications

sought coverage for NRAO facilities in Arizona, California, Hawaii, Iowa, New Hampshire, New Mexico, Texas, Virgin Islands, Virginia, and West Virginia, as well as for AUI's Washington, D.C. headquarters. *Id.* ¶¶ 17–18, 118–20, 131–33. Finally, PIIC alleges that the Policies' premium schedule reflects charges for operations, completed operations, and products exposures only for the locations disclosed in the Specifications and listed in the Location Schedule. *Id.* ¶¶ 124, 134.

Taking PIIC's allegations as true, and drawing all inferences in PIIC's favor, the Court concludes that PIIC has stated a plausible claim for relief on Counts I and II. Although PIIC alleges that AUI's Specifications noted that AUI engaged in research, development, and education in the physical, biological, and engineering sciences, and that it operated laboratories and facilities, AUI did not mention its former operations or facilities at BNL—or indeed, any facilities in New York. Instead, AUI's Specifications—and the corresponding Declarations and Locations Schedule in the Policies—focused on AUI's operations in relation to the NRAO and its telescopes. And BNL is omitted from the Schedule of Locations. These facts, if proven, support a reasonable inference that the parties did not contemplate coverage for AUI's former operations at BNL under the Policies.

The Court concludes that PIIC has stated plausible claims for which relief could be granted on Counts I and II. Accordingly, the Court will deny AUI's motion to dismiss Counts I and II.

### i.     Whether PIIC Waived or Should Be Estopped from Asserting These Claims

AUI argues that PIIC has waived these claims or should be estopped from asserting them because PIIC did not notify AUI in any prior communications—including a reservation of rights—that it would make arguments based on these legal theories to disclaim coverage. Dkts. 7 at 17; 24 at 9.

A defendant (here, AUI) must raise waiver or estoppel as affirmative defenses, *see* Fed. R. Civ. P. 8(c), and the defendant has the burden of establishing affirmative defenses. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "It follows, therefore, that a motion to dismiss filed under Federal Rule of [Civil] Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense . . . ." *Id.* Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense . . . clearly appear *on the face of the complaint*" may the Court dismiss a claim under Rule 12(b)(6) as barred by an affirmative defense. *Id.* (internal quotation marks and citation omitted) (emphasis in original) (holding that complaint did not allege facts sufficiently clear to determine that statute of limitations barred claim). In this case, then, the Court must look to whether AUI, as the defendant, has shown that it can make out the affirmative defenses of waiver or estoppel based on the facts alleged in PIIC's complaint.

Under Virginia law,[5] "[a]n insurer can waive its right to deny coverage by failing to reserve its rights, or it may reserve its right to deny coverage, but for an insurer's reservation of

---

[5] AUI contends that New York Insurance Law § 3420, which requires timely notice of disclaimers for insurance policies "issued for delivery" in New York, applies here because a policy that covers insureds and risks in New York is "issued for delivery" there. Dkt. 7 at 18. This is a somewhat strange argument, since whether New York locations are covered by the policy is one of the main issues in this case, and indeed, the subject of this claim. However, AUI asserts that Virginia common law principles of waiver and estoppel dictate the same outcome.

rights to be effective, it 'must be communicated to the insured, must fairly inform him of the insurer's position, and notice thereof must be timely given.'" *KitBar Enters.*, 291 F. Supp. 3d at 767–68 (E.D. Va. 2018) (finding that insurer had not waived its right to deny coverage where insurer "made clear throughout its entire course of dealing with [the insured] that [it] reserved its rights under the Policy to decline coverage for" a particular lawsuit). "Once an insurance company has reserved its rights it may proceed to defend its insured without prejudicing its later efforts to apply policy exclusions based on the discovery of additional information that shows the insured is not covered by the policy." *Id.* at 768.

Here, PIIC alleges that on October 16, 2019, it issued AUI a letter stating that it would defend AUI in the Marino Action and that it reserved its right to deny coverage on several bases, including "if in the future it is show[n] that a covered claim does not exist with regard to any of the subject policies." Dkt. 1 ¶¶ 108–09. PIIC also alleges that on January 15, 2020, PIIC issued AUI a letter stating that it would defend AUI in the Yuhas Action and that it reserved its right to disclaim coverage on several bases, including "if it is show[n] that the claims fall outside the insuring clause of the [PIIC Policies] or, in the alternative, fall within the purview of one or more of the exclusions contained herein." *Id.* ¶ 115.

At the motion to dismiss stage, the Court concludes that the face of the complaint does not allege facts sufficient to determine that AUI's affirmative defense of waiver bars PIIC's claims on Counts I and II. Indeed, the facts alleged, if true, support a reasonable inference that PIIC has not waived its rights to disclaim coverage because it agreed to defend AUI in both actions only after notifying AUI that it reserved its rights to deny coverage if "a covered claim does not exist with regard to any of the subject policies" or if "the claims fall outside the insuring

clause" of the Policies. Accordingly, the Court will deny AUI's motion to dismiss Counts I and II based on the affirmative defense of waiver.

In Virginia, a party seeking to estop an insurer from denying coverage must establish that he "justifiably relied on the insurer's conduct and was thus misled by the company's behavior into believing the policy was still in force." *Harris v. Criterion Ins. Co.*, 281 S.E.2d 878, 881 (Va. 1981). Estoppel requires four elements: (1) the insurer's representation that coverage exists, (2) the insured's reliance on that representation, (3) the insurer's subsequent change of position, and (4) a resulting detriment to the insured. *City of Salem v. Colegrove*, 321 S.E.2d 654, 657 (Va. 1984). An insurer who undertakes an unreserved legal defense on behalf of an insured is generally estopped from subsequently seeking to avoid liability under the policy. *State Farm Fire & Cas. Co. v. Mabry*, 497 S.E.2d 844, 846 (Va. 1998).

Again, at this stage, the Court concludes that the face of the complaint does not allege facts sufficient to determine that AUI's affirmative defense of estoppel bars PIIC's claims on Counts I and II. In particular, the Court concludes that the complaint does not allege facts that would allow it to determine whether AUI can meet its burden to show the second and fourth elements of estoppel. Accordingly, the Court will deny AUI's motion to dismiss Counts I and II on the basis of the affirmative defense of estoppel.

### 2. Claim Asserting That Bodily Injuries Manifested Before the Policy Period (Count III)

Count III seeks a declaration that the PIIC Policies do not cover the actions because the bodily injuries occurred before the policy period began.

PIIC alleges that the Policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Dkt. 1 ¶ 43. PIIC further alleges that the Policies cover "bodily injury" only if "[t]he 'bodily injury' . . . occurs

during the policy period." *Id.* ¶¶ 140–141. PIIC alleges that the policy period began on

December 1, 2014. *Id.* ¶ 142. PIIC alleges that, according to the underlying complaints, Marino

and Yuhas both developed some TCE-related injuries before the inception of the PIIC Policies.

*Id.* ¶¶ 143–44. Marino's complaint alleges that he was diagnosed with kidney cancer in his right

kidney in 2009 and chronic kidney disease in his left kidney in 2018. *Id.* ¶¶ 70–71. Yuhas's

complaint alleges that he was diagnosed with renal cystic disease in 2008 and chronic kidney

disease, COPD, and Crohn's disease subsequently. *Id.* ¶ 100.

Taking PIIC's allegations as true, and drawing all inferences in PIIC's favor, the Court

nevertheless concludes that PIIC fails to state a claim upon which relief could be granted on

Count III. PIIC's allegations are sufficient to support the possibility that at least some of Marino

and Yuhas's bodily injuries occurred during the policy period, thereby giving rise to potential

coverage. Marino alleges that the chronic kidney disease in his left kidney was discovered after

December 1, 2014. And Yuhas's complaint leaves open the possibility that his chronic kidney

disease also was diagnosed after December 1, 2014. Moreover, under the "injury in fact"

approach, even the alleged injuries diagnosed before December 1, 2014 would be covered

"during [any] progressive damage." *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp. 2d

422, 427 (E.D. Va. 2000). Because both complaints allege facts regarding when the bodily

injuries occurred that "would, if proved, fall within the risk covered by the policy," *Liberty

Univ.*, 792 F.3d at 528 (quoting *AES*, 725 S.E.2d at 535) (quotation marks omitted), PIIC fails to

state a claim on Count III.

Accordingly, the Court will grant AUI's motion to dismiss Count III with respect to

PIIC's duty to defend AUI in the underlying actions.

**3.   Claim Asserting That Bodily Injuries Were Not Caused By an Occurrence (Count V)**

Count V seeks a declaration that the PIIC Policies do not cover the actions because the bodily injuries were not caused by an occurrence.

PIIC alleges that the Policies define an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Dkt. 1 ¶¶ 159, 161. PIIC further alleges that Marino and Yuhas's underlying lawsuits "allege that their injuries were not due to accidental conduct by AUI, but rather, were due to willful and intentional conduct warranting punitive damages." *Id.* ¶ 163. According to PIIC, AUI's alleged willful and intentional conduct does not constitute an "occurrence." *Id.* ¶ 164. PIIC also alleges that the Policies exclude coverage for "bodily injuries" that are expected or intended from the standpoint of the insured. *Id.* ¶ 162. And according to PIIC, Marino and Yuhas's underlying lawsuits allege that AUI expected or intended their bodily injuries. *Id.* ¶ 164. Specifically, Marino and Yuhas allege that AUI fraudulently concealed the presence of TCE in the buildings, structures, facilities, soils, surface waters, groundwaters, ambient indoor air, and drinking water, *Id.* ¶¶ 56, 91, that AUI fraudulently concealed the toxic effects of TCE exposure, *id.* ¶ 82, and that AUI stockpiled TCE at BNL so that it would be used there even after DOE banned the use of TCE at BNL and after EPA declared BNL a Superfund site due to TCE contamination, *id.* ¶¶ 66, 94, 98. PIIC also alleges that the underlying actions allege negligence claims against AUI. *Id.* ¶¶ 55, 78–79, 90, 98. Specifically, Marino alleges that AUI negligently breached its duties to ensure safe working conditions, to supply TCE products in a reasonably safe manner, and to protect the surrounding environment from TCE contamination. *Id.* ¶¶ 55, 78–79. Yuhas alleges that AUI negligently discharged, released, discarded, and disposed of TCE and other toxic

substances, and that AUI negligently breached its duty to protect the surrounding environment from TCE contamination. *Id.* ¶¶ 90, 98.

Under Virginia law, "[t]he terms 'occurrence' and 'accident' are synonymous . . . and refer to an incident that was unexpected from the viewpoint of the insured." *AES*, 725 S.E.2d at 536 (internal quotation marks and citation omitted). "[A]n intentional act is neither an 'occurrence' nor an 'accident' and therefore is not covered by the standard policy." *Id.* "However, even though the insured's action starting the chain of events was intentionally performed, when the alleged injury results from an unforeseen cause that is out of the ordinary expectations of a reasonable person, the injury may be covered by an occurrence policy provision." *Id.* "For coverage to be precluded under a CGL policy because there was no occurrence, it must be alleged that the result of an insured's intentional act was more than a possibility; it must be alleged that the insured subjectively intended or anticipated the result of its intentional act or that objectively, the result was a natural or probable consequence of the intentional act." *Id.*

Taking PIIC's allegations as true, and drawing all inferences in PIIC's favor, the Court nevertheless concludes that PIIC fails to state a claim upon which relief could be granted on Count V. PIIC's allegations are sufficient to support the possibility that AUI could be found liable in the Marino and Yuhas actions without proving either that AUI intended their injuries or that their injuries were the natural and probable consequences of AUI's intentional conduct, thereby giving rise to potential coverage. First, Marino and Yuhas allege that AUI breached duties to ensure safe working conditions and to protect the environment from contamination, neither of which would require proof that AUI intended their injuries or that their injuries were the natural and probable consequences of AUI's conduct. Second, Marino and Yuhas themselves

did not know that TCE exposure may have led to their injuries until 2016, *id.* ¶ 74 and 2018, *id.* ¶

102, respectively. Because both complaints allege facts regarding when the bodily injuries

occurred that "would, if proved, fall within the risk covered by the policy," *Liberty Univ.*, 792

F.3d at 528 (quoting *AES*, 725 S.E.2d at 535) (quotation marks omitted), PIIC fails to state a

claim on Count V.

Accordingly, the Court will grant AUI's motion to dismiss Count V with respect to

PIIC's duty to defend AUI in the underlying actions.

### 4. Whether AUI Had Sufficient Knowledge of Marino's and Yuhas's Bodily Injuries Before the Inception of the Policies (Counts VI & VIII)

Count VI seeks a declaration that AUI knew that "bodily injury" had occurred before the

PIIC policy period, so the TCE lawsuits are not covered. Count VIII seeks a declaration that

coverage is barred because the loss was not "fortuitous," since the risk of loss was known and the

loss was already in progress before the insurance policy was issued.

Under Virginia law, "[a] fortuitous loss is one that does not result from any inherent

defect in the property insured, ordinary wear and tear, or intentional misconduct. A loss resulting

in part from an insured's negligence, however, may still come within the definition of a

fortuitous loss." *Fidelity & Guar. Ins. Underwriters, Inc. v. Allied Realty Co., Ltd.*, 384 S.E.2d

613, 615 (Va. 1989). In that case, even though the insured "was aware of cracking, bulging, and

deterioration" behind a warehouse's rear wall "as early as 1978," the court found "no evidence to

establish that, when [the parties] entered into the insurance contract in 1983, either of them knew

that the retaining wall *inevitably* would fail to support the fill," nor was it certain "that the wall's

failure was *destined* to occur within the time limits of [the insured's] policy." *Id.* at 462

(emphasis added). Thus, "considering the parties' knowledge at the time they entered into the

insurance contract, . . . neither party regarded the loss as 'inevitable.'" *Id.* at 462–63. *See also*

*Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F.2d 148, 152 (4th Cir. 1989) (applying Virginia law) ("[T]he fact that it is known that subsidence will occur does not mean that it will occur during the policy period. Moreover, there is a fundamental distinction between the certainty of subsidence and the certainty of resulting loss.").

PIIC cites non-Virginia law and argues that it has "sufficiently pled that AUI knew of the contamination prior to 2014 as evidenced by the Superfund designation in 1989 and the environmental violations in 1998." Dkt. 23 at 36 nn.19–20. But AUI argues that this is the wrong question—instead, PIIC must allege facts showing that AUI knew that Marino or Yuhas had suffered bodily injury attributable to their TCE exposure at BNL before the policy period. This they have not done, since neither complaint alleges that AUI knew of their bodily injuries before December 2014. Dkt. 24 at 17, 19. Indeed, according to their complaints, Marino and Yuhas did not know of some of their own injuries until after December 2014. *Id.*

PIIC does not allege that AUI knew of these plaintiffs' specific bodily injuries before the policy period began. Even though PIIC alleges that "AUI was aware that its former employees . . . had made claims under the DOL EEOICP as a result of alleged exposure to toxins while working at BNL." Dkt. 1 ¶ 171.

Similarly, the loss in this case is fortuitous. Just as in *Allied Realty*, although, as alleged in PIIC's complaint, AUI knew about TCE contamination at BCL, TCE's toxic health effects, and claims for exposure to TCE before the policy period, neither AUI nor PIIC knew when they entered into the insurance contract that the bodily injuries here would *inevitably* occur during the policy period. Accordingly, the Court will grant AUI's motion to dismiss Counts VI and VIII.

**5.   Whether the Pollution Exclusion Excludes Coverage for Injuries Allegedly Caused by Products Used as Intended and That Did Not Result from "Discharge, Dispersal, Seepage, Migration, Release, or Escape" of a Pollutant (Count VII)**

Count VII seeks a declaration that the pollution exclusion bars coverage for the underlying actions. The policy provides that the following are not provided for under the pollution exclusion:

> (1) "Bodily injury" or "property damage arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'";
>
>> a.   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

Compl. ¶ 44. The policy defines the term "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste." *Id.* ¶ 43. For the exclusion to apply, there must be (1) a "bodily injury," (2) allegedly caused by a pollutant, defined as an irritant or contaminant, (3) that was discharged, dispersed, seeped, migrated, released, or escaped, (4) at or from a premises, site, or location that an insured owned or occupied. *Id.*

In interpreting exclusions under Virginia law, the insurer bears the burden of proving the exclusion applies, and courts must construe the terms of the exclusion "strongly against the insurer." *Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 766, 773 (E.D. Va. 2011). Courts interpreting Virginia law have construed pollution exclusions with similar language as requiring "some type of movement." *Atl. Bulk Carrier Corp. v. AIG Specialty Ins., Co.*, 448 F. Supp. 3d 547, 555 (E.D. Va. 2020). *See also Dragas*, 798 F. Supp. 2d at 778 (finding that exclusion applied where "sulfur, somehow, moved out of the drywall and into the air" and ultimately onto pipes, creating "clear case of dispersal, discharge, or release"); *Firemen's Ins. Co. of Wash., D.C. v. Kline & Son Cement Repair, Inc.*, 474 F. Supp. 2d 779, 798 (E.D. Va.

2007) (finding that exclusion applied where epoxy sealant's toxic fumes traveled from where epoxy sealant was applied on a warehouse's concrete floor to a worker's office on a floor above the warehouse, where they caused injury as a result of inhalation).

In *Atlantic Bulk Carrier Corp.*, the insured had loaded plastic chip-like material into one of its tank trailers, and remnants of those materials remained in the trailers even after they had been unloaded and cleaned. When plastic pellets were later loaded into the tank trailers, the plastic chip-like remnants mixed with the pellets, making them unusable. 448 F. Supp. 3d at 549–50. The court determined that the contamination did not fall within the pollution exclusion "[b]ecause the plastic chip-like material did not move from the place where [the insured] deliberately placed it before it contaminated the plastic pellets, the mixing of the plastic chip-like material with the plastic pellets that occurred in the tank trailer does not fall within the purview of the Pollution Condition definition." *Id.* at 557.

Taking PIIC's allegations as true, and drawing all inferences in PIIC's favor, the Court concludes that PIIC fails to state a claim upon which relief could be granted on Count VII. PIIC's allegations are sufficient to support the possibility that AUI could be found liable in the Marino and Yuhas actions for at least some bodily injury caused by conduct other than the "discharge, dispersal, seepage, migration, release, or escape" of a pollutant, thereby giving rise to potential coverage. Marino and Yuhas allege TCE exposure through daily use of TCE as a cleaning agent and from groundwater and environmental contamination around BNL. Dkt. 1 ¶¶ 64–65. The latter means of exposure could involve "discharge, dispersal, . . . release, or escape" of a pollutant, and any resulting injuries may fall within the pollution exclusion. But direct contact with TCE while using it as directed does not involve movement away from where the substance was deliberately placed. Thus, any resulting injuries would not fall within the pollution

exclusion. As in *Atlantic Bulk Carrier Corp.*, the material in PIIC's allegations (here, TCE) did not move from where AUI, Marino, and Yuhas deliberately placed it and where it was intended to be: in aerosol cans and other dispensers, and as applied to the computer surfaces that Marino and Yuhas were cleaning. In those places, Marino and Yuhas contacted TCE through their skin. Of course, Marino and Yuhas also allege that they inhaled TCE, but that exposure was still based on their deliberate placement of TCE on the computers they were servicing.

Accordingly, because AUI could be found liable for bodily injury not encompassed within the pollution exclusion, the pollution exclusion cannot relieve PIIC of its defense obligation, and the Court will grant AUI's motion to dismiss Count VII.

### 6. Whether the Employment and Workers Compensation Exclusions Preclude Coverage for the Yuhas Action (Count IX)

Count IX seeks a declaration that the employment and workers compensation exclusions preclude coverage for the Yuhas Action.

For the employment and workers compensation exclusion to apply, the injury must arise "in the course of employment" or "performing duties" for AUI. Dkt. 1 at 44. If the plaintiff as not an employee when he sustained the injury, then the exclusion does not negate coverage for the injury. *Id.* The Court must then look to the plaintiff's status at the time of injury.

PIIC asserts that "[t]here is not a single averment in [Yuhas's] complaint that states he used TCE after his employment ended in 1998. There is not a single averment in his complaint that Yuhas was exposed to TCE after his employment ended in 1998." Dkt. 23 at 39. But AUI corrects PIIC's mistaken understanding. First, although Yuhas stopped working for AUI at BNL in 1998, Yuhas worked for a different employer, BSA, at BNL until 2007. Dkt. 24 at 22. Second, Yuhas's complaint alleges that "AUI's stockpile of TCE products amassed during the 1990's was so massive that it continued to be used by BNL workers in the course of their employment

duties long after the DOE terminated AUI as the 'operating contractor' for BNL in 1998. BSA employees, including Yuhas, continued to use TCE products drawn off the massive stockpile amassed by AUI until 2006 if not later." *Id.* at 22–23; *see also* Dkt. 7 at 36–37. Because Yuhas alleges in part that AUI is liable for bodily injury that Yuhas sustained after his employment with AUI ended, the employment exclusion does not apply to preclude coverage.

Accordingly, the Court will grant AUI's motion to dismiss Count IX.

### C.      Subject Matter Jurisdiction over Claims About Duty to Indemnify

AUI argues that PIIC's claims regarding the duty to indemnify should be dismissed because they are not yet ripe, or, in the alternative, that the Court should exercise its discretion to decline to hear PIIC's claims.

Federal courts may only address issues that are ripe for adjudication. In determining whether a case is ripe, courts must assess "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967). "A claim is not ripe for adjudication if it rests upon contingent future events that . . . may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations and internal quotation marks omitted).

The Declaratory Judgment Act permits a federal court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act gives federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). A district court has "great latitude" in determining whether to entertain a declaratory judgment action. *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998) (citing *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998);

*Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996); *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937)).

The Fourth Circuit has instructed district courts to consider several factors in deciding whether to exercise its discretion to hear a declaratory judgment action. A declaratory judgment "is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (quoting *Centennial Life Ins. Co.* 88 F.3d at 256 (4th Cir. 1996); *Aetna Cas. & Sur. Co.* 92 F.2d at 325 (4th Cir. 1937)) (ellipses in original). In addition, whenever a parallel proceeding is pending in state court, district courts must consider "federalism, efficiency, and comity." *Id.*; *see also Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004).

In *Trustgard Insurance Co. v. Collins*, 942 F.3d 195 (4th Cir. 2019), the Fourth Circuit reviewed a declaratory judgment regarding an insurance company's duty to indemnify before its liability had been determined in a state court proceeding. The *Trustgard* court discussed but declined to determine whether the district court had Article III standing or its claims were not yet ripe because its alleged injury was "hypothetical and contingent." *Id.* at 200 (citing *A/S J. Ludwig Mowinckles Rederi v. Tidewater Const. Co.*, 559 F.2d 928, 931 (4th Cir. 1977) (declining to determine who was responsible for paying any potential judgment because question was unripe until liability was determined, and facts determining liability remained unclear)). Instead, the Fourth Circuit held that the district court should have exercised its discretion to decline to hear the action. *Trustgard*, 942 F.3d at 201. The Fourth Circuit noted that it could—and suggested that it should—address "'a discretionary jurisdictional question before a nondiscretionary jurisdictional question.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100

28

n.3, (1998)); *see also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (noting that it could dismiss a case on forum non conveniens grounds before resolving personal and subject matter jurisdiction questions because forum non conveniens "involves a deliberate abstention from the exercise of jurisdiction"). The *Trustgard* court explicitly distinguished duty-to-defend cases from duty-to-indemnify cases, noting that the former did not raise the same risk of rendering an advisory opinion. *Id.*; *see also Liberty Univ.*, 792 F.3d at 528 ("The duty to defend is much broader than the duty to indemnify because, 'while . . . the duty to indemnify relies on litigated facts,' the duty to defend arises 'whenever the [underlying] complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy.'") (citations omitted).

Indeed, this Court and other district courts in this circuit have held that ruling on an insurer's duty to indemnify while the underlying action remains pending would be "premature." *Nautilus Ins. Co. v. Strongwell Corp.*, 648 F. Supp. 2d 807, 821 (W.D. Va. 2013) (Conrad, J.) (quoting *Penn-America Ins. Co. v. Mapp*, 461 F. Supp. 2d 442, 458 (E.D. Va. 2006)).

In light of *Trustgard*, the Court declines to address the nondiscretionary jurisdictional question of ripeness. However, the Court will exercise its discretion to refrain from ruling on the indemnification issue until the underlying actions are resolved.

Accordingly, the Court will deny AUI's motion to dismiss PIIC's duty-to-indemnify claims for lack of subject matter jurisdiction.

## IV.   CONCLUSION

For the reasons stated, the Court grants in part and denies in part AUI's motion to dismiss. The Court **GRANTS** the motion to dismiss Counts III, V, VI, VII, VIII, and IX. The

Court **DENIES** the motion to dismiss Counts I and II. The Court also **DENIES** the motion to dismiss the duty-to-indemnify claims for lack of subject matter jurisdiction.

It is so **ORDERED**.

The Clerk of Court is directed to send this Order to all counsel of record.

ENTERED this 29th day of September, 2021.